**Mary CLAYTON, Plaintiff,**

v.

**Charles McCARY, dba M & M Motors, Defendant.**

**Civ. A. No. C 76–153 A.**

United States District Court,
N. D. Ohio, E. D.

Dec. 29, 1976.

Gail I. Auster, Summit County Legal Aid Society, Akron, Ohio, for plaintiff.

Carl L. Reed, Akron, Ohio, for defendant.

## MEMORANDUM OPINION AND ORDER

CONTIE, District Judge.

Plaintiff initiated this action to redress alleged tampering with an odometer in the sale of an automobile. The Court duly heard testimony and received exhibits on October 14 and 18, 1976. The following shall constitute the Court's findings of fact and conclusions of law as required by Rule 52, Federal Rules of Civil Procedure.

### PLEADINGS

The complaint filed by plaintiff asserts a violation of the Odometer Requirements, Motor Vehicle Information and Cost Savings Act, 15 U.S.C. § 1981 *et seq.* for which treble damages are sought. Essentially, plaintiff alleges two distinct claims under the Federal Odometer Requirements. First, plaintiff asserts that the defendant unlawfully tampered with the odometer on the automobile sold her with the intent to change the mileage indicated thereon. Secondly, it is alleged that the defendant falsely represented the mileage on the automobile in violation of the disclosure requirements of said law.

In addition, plaintiff asserts a pendant state claim and seeks rescission, or in the alternative, damages. Specifically, plaintiff contends that defendant has engaged in two practices, relative to the sale of the automobile to plaintiff, which are assertedly violative of the Ohio Consumer Sales Practices Law, Ohio Revised Code (hereafter O.R.C.) § 1345.01 *et seq.* It is first asserted that defendant committed deceptive sales practices by allegedly expressly representing to plaintiff that the automobile was in "A-Number One" condition when it was not, and that it had uses and benefits which it did not in fact have. For her second state law claim, plaintiff alleges that defendant committed unconscionable sales practices, to wit: knowingly took advantage of plaintiff's ignorance of automobiles; knew the sales price of the automobile was excessive; knew of plaintiff's inability to receive substantial benefit from the automobile; and knowingly gave a misleading opinion upon which plaintiff was likely to detrimentally rely.

Finally, as an alternative pendant state claim, plaintiff alleges common law fraud. In essence, plaintiff contends that defendant, with the intent to defraud and deceive her, made false and fraudulent statements concerning the condition and quality of the automobile. The relief sought is both actual and punitive damages.

Defendant has essentially denied the allegations of the complaint.

### JURISDICTION

The Court concludes that it has jurisdiction of the subject matter of this action pursuant to 15 U.S.C. § 1989.

### FACTS

Defendant Charles McCary is the sole owner and salesman of M & M Motors, an unincorporated association located in Akron, Ohio, and engaged in the business of selling used automobiles. As such it is defendant's usual practice to purchase used cars, perform whatever mechanical repairs and body work on such cars as he deems necessary, and then to re-sell the same.

On June 2, 1975, defendant purchased a blue 1966 Dodge Dart 270 four door sedan, serial number LH41B69111764, from one Robert Linscott, an approximately fifty year old male. Linscott had purchased the automobile from one Kenneth T. Bolling. Bolling purchased the auto approximately three years earlier for Two hundred fifty dollars ($250.00). Although the automobile was titled in Bolling's name, it was actually his son's car as his son drove the auto. At the time of the sale to Linscott, Bolling testified that the odometer was broken and had not been repaired. In his opinion the condition of the car was poor in that no mechanical work had been done on the car.

Defendant was introduced to Linscott by a mutual friend, Sylvester Wade, to whom defendant tendered a check in the amount of Two hundred eighty dollars ($280.00), representing the purchase price of the subject automobile, and constituting satisfaction of a debt owed by Linscott to Wade. At the time of the purchase, defendant filled out an odometer statement as required by federal law. He recorded the mileage then showing on the automobile odometer, 47,890 miles, on a previously prepared form which was then signed by the seller Linscott. Defendant then placed the odometer statement in his files as was his custom.

Prior to the completion of this transaction, defendant drove the automobile and thought the engine was good. Although the auto was in need of some work, he believed it was basically decent and thus decided to buy it. Defendant purchased the car with the express intention of repairing it and giving it to his daughter.

Subsequent to the above purchase, defendant made a number of repairs on said automobile including replacement of the front brakes, muffler and tail pipe, points, and tires. Defendant testified that he expended the sum of Eighty-eight dollars ($88.00) for parts and materials in making such repairs. Defendant also repainted the automobile, while his daughter cleaned the interior in anticipation of receiving the car from her father.

On or about July 14, 1975, plaintiff went to M & M Motors looking to purchase a used car. At that time plaintiff was in need of an automobile to look for employment and to transport her son to school. Her financial situation was such that she could not afford a new car or a high priced used car. While at M & M Motors, plaintiff inquired of defendant the price of a Mustang sitting on his lot. Defendant quoted her a price of Seven hundred fifty dollars ($750.00). Plaintiff made no further inquiries but rather left the premises as it was getting late and defendant was in the process of closing for the day.

The next day plaintiff returned to M & M Motors having seen the subject blue Dodge Dart on the lot for the first time when going home from work. Plaintiff inquired of defendant the price of said automobile. Defendant informed her that he did not want to sell the automobile as he had purchased and repaired it with the intention of giving it to his daughter. Defendant finally quoted plaintiff a price of Five hundred fifty dollars ($550.00).

On July 16, 1975, plaintiff once again went to M & M Motors accompanied by her first cousin, William Knott. At that time, defendant told plaintiff that the automobile was in A–1 shape and pointed out the low mileage. As defendant testified, he probably stressed the low mileage to plaintiff and her companion. He further informed them that the mileage was low because he purchased the car from an old man. Defendant also told plaintiff and her companion that he had purchased the car for his daughter, and consequently fixed it relating the repairs listed above. Defendant stated, however, that he would sell the car to plaintiff because he had had a misunderstanding with his daughter.

The defendant at this time also took plaintiff and her cousin for a test drive of approximately 3 to 4 miles. Only defendant drove the car. During this test drive, plaintiff noticed that the exhaust system was loud and that the brakes squeaked. When plaintiff commented thereon, defendant stated that he would repair the exhaust system, and assured plaintiff that the brakes squeaked because they were new, but that they would cease to do so with use.

After the test drive, plaintiff's cousin proceeded to look under the hood of the automobile. He wanted to check the oil, but discovered that the oil stick was broken. Upon informing defendant of this, defendant assured plaintiff and her cousin that there was no need to worry as an oil stick was readily obtainable at a junk yard.

Despite these problems, plaintiff thought the automobile was good because defendant stated that he planned to give the car to his daughter. Plaintiff further relied upon the

representations made to her by defendant since she lacked basic knowledge of and familiarity with automobiles. Believing the subject automobile to be the best she could buy with her limited resources, plaintiff expressed her interest in the same to defendant. Defendant thereupon told plaintiff that he would sell her the automobile for the aforesaid price of Five hundred fifty dollars ($550.00), but that a down payment was necessary. Plaintiff tendered to defendant the sum of Three hundred fifty dollars ($350.00) as a down payment on the subject automobile.

Bearing the date of the transaction, July 16, 1975, is a used car order representing the contract of sale entered into by plaintiff and defendant. The box on said order form marked "SOLD AS IS" was checked, and plaintiff signed beneath the same and the statement that "I hereby make this purchase knowingly without any guarantee, expressed or implied, by this dealer or his agent." The section of the form denominated "SOLD WITH WARRANTY" has the word "none" written through it. Plaintiff further agreed to accept delivery of the automobile on July 18, 1975.

Also dated July 16, 1975 is a document entitled "New or Used Car Odometer Mileage Statement." This statement consists of the same prepared form used by defendant in the earlier purchase of the automobile from Linscott. The information contained thereon included the make, body type, year, model, color, number of cylinders, and vehicle identification number. Although there was also a place to indicate the last license plate number, it was not so listed. Nor was there any reference to the Motor Vehicle Information and Cost Savings Act, as required by federal regulations. Defendant recorded on the statement the number of miles then showing on the odometer, namely 47,888 miles, which was two miles less than when he purchased the auto, and signed the same. Plaintiff also signed the statement in the space marked "Signature of Witness."

On July 18, 1975, plaintiff returned to M & M Motors and tendered to defendant the sum of Two hundred dollars ($200.00), representing the balance of the purchase price and constituting payment in full. Thereupon, plaintiff took possession of the automobile. At that time defendant informed her that he had changed the oil, but that she should have it changed again.

During the first week after assuming ownership of the subject automobile, plaintiff drove it to a Sohio Station on Wooster Road in Akron for an oil change. The station attendant told plaintiff that the oil was very thick and dirty. Shortly after the oil was changed plaintiff noticed that it was leaking and that she was losing oil. The oil loss was so rapid that according to plaintiff's testimony she had to add a quart of oil to the automobile almost every day. At a cost of approximately one dollar per quart, plaintiff estimated that she expended approximately Twenty-five dollars ($25.00) for oil. Plaintiff also purchased a battery for Twenty-five dollars ($25.00) and a headlight for Four and 16/100 dollars ($4.16) during that first week.

On or about September 25, 1975, the automobile engine began knocking. Plaintiff thereupon drove it to Roy's Sohio Station on Edgewood in Akron. The proprietor, Roy Hennis, told plaintiff that a rod was knocking and that the engine needed to be replaced. He gave her an oral estimate of Three hundred dollars ($300.00) as the cost of a used later model engine. Thereupon, plaintiff took the automobile back to M & M Motors since she did not have the funds to purchase a replacement engine.

Defendant after listening to the engine confirmed that a rod was indeed knocking and that the engine needed to be replaced. He told plaintiff that he could replace the engine with a used one for approximately One hundred twenty-five dollars ($125.00) to One hundred fifty dollars ($150.00). Plaintiff, however, stated that she could not then afford the cost of a replacement engine. In light thereof, defendant told plaintiff that he would send someone over to her house to purchase the automobile from her. Such individual, however, never materialized.

There is some conflict in the testimony whether plaintiff at some time prior to September, 1975, or at the same time she returned the car to defendant because the engine was knocking, informed defendant that the speedometer and/or odometer were not functioning properly. In any event, defendant was so informed and offered to install a new speedometer cable for plaintiff if she would obtain the same. Defendant, however, testified that he never replaced the cable.

After plaintiff spoke with defendant concerning replacement of the automobile engine she contacted the Better Business Bureau. The Bureau referred her to the Consumer Protection Agency in Columbus which directed her finally to the Consumer Protection Agency office in Akron. On September 29, 1975, plaintiff filed a written complaint with such agency concerning the automobile. Jerry Ellerson, an Economic Counseler with the agency, by a letter dated October 8, 1975, informed defendant of plaintiff's complaint and requested that defendant contact him. Upon receipt of the letter, defendant called Mr. Ellerson and told him to have plaintiff bring the automobile to his place of business so he could have the engine replaced for her free of charge.

Defendant employed two mechanics, Robert Kalain and Robert Purvis, to replace the engine in the subject automobile and paid them One hundred twenty-five dollars ($125.00) in parts and cash for so doing. They obtained a 1967 engine for the automobile from a junk yard. In the process of replacing the engine, they found that the oil pan of the old engine was pushed up or caved in. In such condition the oil intake screen inside the pan would not pick up the oil and lubricate the engine. In time with the oil supply cut off, the rods on the car would knock and the engine eventually lock up. Testimony indicated that the same would occur within twenty-five to fifty miles of use. The automobile had to have run over some object to cause the oil pan to be in such condition. The Court finds that the engine lockup was caused by oil starvation resulting from the damaged oil pan.

Further, the Court finds that the damage to the oil pan occurred while the auto was in plaintiff's possession.

After the new engine and oil pan were installed, the automobile was returned to defendant. The exhaust pipe, however, was not properly aligned, but rather was hanging underneath the auto. Plaintiff noticed the same when she came to pick the car up and told Mr. Ellerson, who had called defendant, about the exhaust pipe. After himself speaking with Mr. Ellerson, defendant told plaintiff he would fix the exhaust pipe and that she should come back the next day for the automobile. In the meantime defendant proceeded to install a new front exhaust pipe and muffler on the automobile at a cost to him of about Thirty-two ($32.00) to Thirty-four ($34.00) dollars. Also, the idler arms and pittman arms were pushed up near the exhaust, and according to defendant's testimony the car would thus not steer. He heated these arms in order to return them to their proper position when the exhaust was in place.

Plaintiff accompanied by her cousin William Knott returned to M & M Motors the next day to pick up her automobile. With Knott driving, they took the car for a test drive during which he noticed that the gears were not shifting properly. Upon advising defendant of the same, he informed them that apparently a part had been left out in the installation of the motor and that he would contact the man who did the installation work. Defendant told plaintiff to return the next day for the car.

Plaintiff alone returned to M & M Motors as instructed to do so by defendant. At that time she again took possession of the automobile, and defendant gave her two used snow tires. He thought that they would probably be useable for one winter although not in fact used by plaintiff, and he gave them to her because of all the problems she had experienced. Thus, on or about the last day of October and approximately three weeks after plaintiff delivered her automobile to defendant, she was able to drive home.

Approximately one month later, plaintiff again began to experience problems with the automobile. Oil was leaking from the car and the rods started to knock. Finally on December 1, 1975, as plaintiff was driving to the Akron-Canton Airport, the knocking became so loud that she had to leave the car along the roadside. After hitching a ride to the Airport, she called the defendant who told her to call him again when she arrived home. Plaintiff secured a ride to her home from a friend, and enroute they stopped at the car, tried starting the same, and heard a loud sound after which the engine was silent. On December 2, 1975, plaintiff had the automobile towed by Stan's Towing and Service at a cost of Twenty-five dollars ($25.00). The car was towed to her home after delivery of the same was refused by defendant.

During December, 1975, the car remained parked outside plaintiff's home, and the tires eventually went flat. With regard to the tires, plaintiff recalled that on July 16, 1975, they looked good, being black and shiny, and defendant told her the same when she originally purchased the automobile. When she accepted delivery of the car on July 18, 1975, she did not inspect them, but about two weeks later noticed that the tires were painted. It appears, however, that defendant merely put a dressing on the same to protect against the overspray when he painted the car.

On January 31, 1976, plaintiff purchased a 1968 four door Plymouth from Graham Chrysler Plymouth in Akron for Five hundred dollars ($500.00). Subsequently on October 1, 1976, plaintiff had the subject Dodge Dart towed to Graham for an estimate of the cost of the repairs needed to be made in order to render the vehicle operable once again. The mechanic who checked the car, Eli McCombs, found that the engine was locked and was of the opinion that, considering the age and condition of the car, he would not fix the same. To the same effect was the opinion of James Regalliss, Service Manager at Graham, who estimated that to repair the motor it would take 16 to 18 hours at a cost of Sixteen

dollars ($16.00) per hour for labor plus parts. A couple of Graham's mechanics, however, did express an interest in the car and thereby indicated that the car was of some value.

The mileage on the subject automobile on October 1, 1976, according to Graham's work order, was 47,872 miles; this was .16 miles less than when purchased by plaintiff. Such is also the present mileage on the car as stipulated by the parties. With regard to the odometer, Arlin Vanke, a former race car driver and mechanic, inspected the same while the car was parked at Graham. It was his opinion that an odometer could not run backwards, but that it could malfunction and vibrate backwards if a pin or the gears were broken. Mr. Vanke further found that the odometer on the subject vehicle did not appear tampered with. In light of all the evidence presented, the Court finds that defendant did not tamper with the odometer.

## CONCLUSIONS OF LAW

Plaintiff's first cause of action is founded upon the Odometer Requirements of the Motor Vehicle Information and Cost Savings Act, 15 U.S.C. § 1981 *et seq.* Specifically, plaintiff alleges that defendant violated the provisions of 15 U.S.C. § 1984 and § 1988.

The Congressional purpose in the enactment of the odometer requirements was to prohibit tampering with motor vehicle odometers, and to establish safeguards for the protection of consumers in motor vehicle sales. See 15 U.S.C. § 1981. In furtherance of that purpose § 1984 provides that:

It is unlawful for any person or his agent to disconnect, reset or alter the odometer of any motor vehicle with the intent to change the number of miles indicated thereon.

Likewise, § 1988 provides:

(a) Not later than 90 days after October 20, 1972, the Secretary shall prescribe rules requiring any transferor to give the following written disclosure to the transferee in connection with the transfer of ownership of a motor vehicle:

(1) Disclosure of the cumulative mileage registered on the odometer.

(2) Disclosure that the actual mileage is unknown, if the odometer reading is known to the transferor to be different from the number of miles the vehicle has actually traveled.

Such rules shall prescribe the manner in which information shall be disclosed under this section and in which such information shall be retained.

(b) It shall be a violation of this section for any transferor to violate any rules under this section or to knowingly give a false statement to a transferee in making any disclosure required by such rules.

Pursuant to that statutory mandate, the Secretary promulgated disclosure rules which are found at 49 C.F.R. § 580.1 *et seq.* In particular, § 580.4 sets forth the information to be contained in a written statement to be signed by the transferor and presented to the transferee before execution of any transfer of ownership documents. Under § 580.4 such information includes:

(a) . . .

(1) The odometer reading at the time of transfer; and, unless provided elsewhere on a transfer document integal (sic) with the odometer disclosure;

(2) The date of the transfer;

(3) The transferor's name and current address; and

(4) The identity of the vehicle, including its make, model, and body type, its vehicle identification number, and its last plate number.

(b) In addition to the information provided under paragraph (a) of this section, the statement shall refer to the Motor Vehicle Information and Cost Savings Act and shall state that incorrect information may result in civil liability under it.

(c) In addition to the information provided under paragraph (a) of this section, if the transferor knows that the odometer reading differs from the number of miles the vehicle has actually traveled, and that the difference is greater than that caused by odometer calibration error, he shall include a statement that the actual mileage is unknown.

In order to render effective the odometer requirements, § 1989 provides for civil actions to enforce liability for violations thereof. Particularly pertinent thereto is the provision of § 1989 that:

(a) Any person who, with intent to defraud, violates any requirement imposed under this subchapter shall be liable in an amount equal to the sum of—

(1) three times the amount of actual damages sustained or $1,500, whichever is the greater; and

(2) in the case of any successful action to enforce the foregoing liability, the costs of the action together with reasonable attorney fees as determined by the court.

Based on the foregoing pertinent provisions, plaintiff essentially claims that the defendant violated the disclosure requirements of the Act and tampered with the odometer. Furthermore, plaintiff contends that defendant did the same with the intent to defraud her.

■ With regard to the disclosure requirements, defendant allegedly failed to provide the following information required by § 580.4(a)(4), (b), and (c) respectively: the last plate number; a reference to the Act and potential liability under it; and a statement that the actual mileage is unknown. The Court has previously found that the odometer statement provided plaintiff by defendant failed to record the last license plate number of the subject automobile, and to refer to the Act. Clearly then with regard to those two disclosure requirements of the rules defendant violated § 1988. Further analysis is required, however, to determine whether defendant also violated that section in not indicating that the actual mileage was unknown.

■ Section 580.4(c), quoted above, in essence provides that if the transferor "knows" that the odometer reading is incorrect, and that the difference is greater than that caused by a calibration error, he shall

indicate that the true mileage is not known. In addition, § 1988(b) states that it is a violation of said section for a transferor to "knowingly" give a false statement in making the required disclosures. The key words in both provisions appear to be "know" and "knowingly." The Congressional intent with regard to the use of "knowingly" in § 1988(b) is expressed in part in Senate Report No. 92–413, 1972 U.S.Code Cong. & Admin.News at 3971–72:

> Section 408 makes it a violation of the title for any person "knowingly" to give a false statement to a transferee. This section originally allowed a person to rely completely on the representations of the previous owner. This original provision created a potential loophole, however. For example, a person could have purchased a vehicle knowing that the mileage was false but received a statement from the transferor verifying the odometer reading. Suppose an auto dealer bought a car with a 20,000 mile odometer verification but any mechanic employed by that auto dealer could ascertain that the vehicle had at least 60,000 miles on it. The bill as introduced could have permitted the dealer to resell the vehicle with a 20,000 mile verification. In order to eliminate this potential loophole the test of "knowingly" was incorporated so that the auto dealer with expertise now would have an affirmative duty to mark "true mileage unknown" if, in the exercise of reasonable care, he would have reason to know that the mileage was more than that which the odometer had recorded or which the previous owner had certified.

One court has interpreted this language to mean that constructive knowledge will flow from a dealer's failure to investigate when on notice that a prior odometer statement may be incorrect. *Pepp v. Superior Pontiac GMC, Inc.,* 412 F.Supp. 1053, 1055 (E.D.La. 1976). It does not, however, indicate an intention to require an auto dealer to exercise every conceivable precaution. *Id.*

In the instant case, it does not appear that defendant at the time he purchased the automobile from Linscott had reason to know that the odometer was inaccurate. Thus constructive knowledge of the same cannot follow from his failure to investigate whether the odometer was functioning properly. Constructive knowledge of the defective odometer can, however, be attributed to defendant in that he filled out the odometer statement both when he purchased the auto and when he sold it to plaintiff. Such statements were kept in defendant's files and, as found earlier by the Court, show a loss of two miles instead of a gain of the approximately 24 miles defendant claimed to have driven the car during his ownership thereof. Thus in the exercise of due diligence, defendant could have determined that the odometer was not working and that the actual mileage traveled by the auto was unknown. In any event, the defendant had at most constructive knowledge of the inaccuracy of the odometer and did not have actual knowledge of the same.

Thus in light of the foregoing it appears, and the Court so finds that defendant violated the disclosure provisions of § 1988.

Plaintiff further alleges that defendant violated the provisions of § 1984 by tampering with the odometer on the subject automobile with an intent to defraud. No evidence of actual tampering was presented. Rather plaintiff relies upon an inference that defendant altered the mileage, citing as authority for such proposition *Delay v. Hearn Ford,* 373 F.Supp. 791 (D.C.S.C.1974). The *Delay* case is clearly distinguishable, however. In that case, the plaintiff was the previous owner of the car, and only the defendant owned the auto in the interim between the initial sale to defendant and the repurchase by plaintiff. When plaintiff sold the car to defendant there was approximately 72,000 miles on the odometer and yet when he purchased it from defendant the odometer registered less than 49,000 miles. Based on these facts it was reasonable to infer that defendant altered the odometer since the car was under its control and dominion during the entire period in which the claimed change took place. Further, the Court stated that absent a show-

ing by the defendant as to when and by whom the alteration occurred such a conclusion was compelled. *Delay v. Hearn Ford, supra*, at 795.

█ In the case at bar, however, the odometer registered only two miles less at the time of sale to plaintiff than at the time of original purchase by defendant. Logic, and common sense would seem to dictate that insofar as defendant had something to gain by rolling back the odometer, he would have rolled it back more than two miles. Also, it is important to note that despite the fact that plaintiff drove the automobile for about three months, it presently registers 16 miles less than when plaintiff purchased it. These changes in the odometer readings seem more logically to be attributed to a malfunctioning of the same than to tampering. Thus it cannot reasonably be inferred that defendant tampered with the odometer in violation of § 1984. Rather, in light of the evidence presented the Court is compelled to find as stated above that defendant did not alter or reset the odometer in violation of § 1984.

Therefore, the Court concludes that with regard to plaintiff's claims under the odometer requirements, defendant did not violate § 1984, but did violate the disclosure provisions of § 1988. Said violation does not, however, by itself automatically give rise to liability under § 1989. As stated by the court in *Pepp v. Superior Pontiac GMC, Inc., supra*, at 1054, "[s]ection 1989 makes it clear that a mere negligent violation, or even a *knowing* violation of the regulations, does not give rise to a cause of action." Pursuant to its terms § 1989(a) predicates liability upon the existence of both a violation of the odometer requirements, and an intent to defraud. Thus in order to render defendant herein liable for violating the disclosure requirements, it must be established that he did so with the intent to defraud plaintiff.

██ The intent to defraud cannot be presumed, but it can be inferred from all the surrounding facts. See *Pepp v. Superior Pontiac GMC, Inc., supra*, at 1055. In the instant case, plaintiff has wholly failed to present substantial evidence from which the Court could reasonably conclude that defendant harbored fraudulent intent. Cf. *Klein v. Pincus*, 397 F.Supp. 847 (E.D.N.Y. 1975). Moreover, as stated by the court in *Mataya v. Behm Motors, Inc.*, 409 F.Supp. 65 (E.D.Wis.1976), at 69:

> If it is assumed that the intent to defraud required by § 1989(a) may be presumed from a finding of actual knowledge of odometer alteration, a question would nevertheless remain as to whether an intent to defraud can be based solely upon a finding of constructive knowledge which is all that seems to be required for a violation of § 1988(b). The better view would seem to be that actual knowledge is necessary to support an inference of intent to defraud and, correspondingly, recovery under § 1989(a).

As the Court has previously found, defendant had at best constructive knowledge of the inoperative condition of the odometer, and according to the more reasoned view, such is insufficient to draw an inference of fraudulent intent. In addition, defendant's constructive knowledge is premised on his negligence in failing to investigate and determine that the odometer was not working. Evidence of mere negligence not amounting to gross or reckless conduct does not imply the presence of an intent to defraud. See *Pepp v. Superior Pontiac GMC, Inc., supra*, at 1055–56.

To establish fraudulent intent, plaintiff places heavy reliance again on *Delay v. Hearn Ford, supra*. The court therein stated that the failure to disclose that the actual mileage was unknown might be evidence of an intent to defraud absent a showing by the defendant that the alteration was unintentional or made with another intent. *Delay v. Hearn Ford, supra*, at 795. Such a showing could be made by evidence that the alteration was accidental, malicious mischief, etc. *Id.* Ignorance as to the change would not, however, suffice to overcome a finding of fraudulent intent. *Id.* Thus the Court held at 796:

> All that is required of a purchaser before recovery will be allowed is that a change

in the odometer reading has occurred and that the seller has failed to disclose the change. An intent to defraud arises from the proof of the foregoing in the absence of an explanation of the odometer change.

In the instant case, there was a change in the odometer reading and defendant failed to disclose the same. Defendant did not however, have actual knowledge of the alteration, and the Court has found that he was not responsible therefor. Moreover, through the testimony of Mr. Vanke defendant proffered an explanation of the odometer malfunctioning which is highly possible and plausible in light of the fact that the odometer registered less mileage despite continued use by plaintiff. Thus, the Court finds the lack of an intent to defraud on the part of defendant.

■ Therefore, plaintiff has failed to show that defendant violated the disclosure requirements with the requisite fraudulent intent. Absent such a showing, defendant is not liable to plaintiff under § 1989(a) and plaintiff is not entitled to recover attorney fees.

Plaintiff's second and third claims are based on the Ohio Consumer Sales Practices Act, Chapter 1345 of the Ohio Revised Code. Specifically plaintiff alleges that defendant has committed a deceptive consumer sales practice under § 1345.02 O.R.C., and an unconscionable consumer sales practice under § 1345.03 O.R.C.

■ Both of these claims, although founded upon a state statute, are within the Court's pendent jurisdiction. It is well established that a federal court may exercise jurisdiction over state law claims under the doctrine of pendent jurisdiction where a substantial federal claim is presented, and the federal and state claims "derive from a common nucleus of operative fact." *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

Section 1345.02 provides in pertinent part that:

(A) No supplier shall commit a deceptive act or practice in connection with a consumer transaction. Such deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction.

(B) Without limiting the scope of division (A) of this section, the act or practice of a supplier in representing any of the following is deceptive:

(1) That the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits it does not have;

(2) That the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not.

Thus commission of any listed act or practice is deceptive and a violation of the Act.

■ As related to the instant action, plaintiff claims that defendant violated both § 1345.02(B)(1) and (2). It is alleged that defendant represented that the subject automobile had "uses, or benefits it does not have." O.R.C. § 1345.02(B)(1). The "uses or benefits" the auto allegedly did not have are those normally attributed to an automobile, namely reliable transportation. In other words, the subject vehicle purportedly failed to fulfill its normal function and purpose of providing a means of transportation from one place to another in an efficient and reliable manner. At the time of the sale to plaintiff, however, the car was apparently in good running condition and did provide plaintiff with good transportation. The car lost its use or benefit as a result of the engine lockup. As the Court has found above, the engine lockup occurred during plaintiff's ownership, and as a result of the oil cut off to the engine caused by the auto hitting an object and caving in the oil pan. Thus, defendant did not commit a deceptive practice within the terms of § 1345.02(B)(1).

■ Plaintiff further alleges that defendant violated § 1345.02(B)(2) by representing that the subject vehicle was of "a particular standard or quality" when it was not. As the Court has previously found,

defendant represented the auto to be in "A-Number One" condition. Such representation, however, can only be rightfully interpreted in relation to the subject vehicle. In other words, the auto was represented to be in "A-Number One" condition for a car of its age, make, and previous use. Plaintiff has wholly failed to prove that it was not in such condition at the time of sale. It can reasonably be expected, for example, that the headlight of a 1966 auto might need to be replaced. Moreover, the major problems which developed with the car occurred more than a month after the sale, and after use or possible misuse by plaintiff. Defendant has thus not committed a deceptive practice in violation of § 1345.02(B)(2).

In addition to the deceptive practices enumerated in § 1345.02(B), the Act provides in § 1345.05(B)(2) that the director of commerce may adopt substantive rules defining acts or practices which violate § 1345.02 and § 1345.03. Pursuant to that authority, the director has promulgated rules defining deceptive trade practices. Relevant hereto is Rule CO cp–3–01.10 which states:

Sale of Motor Vehicles—It shall be a deceptive act or practice in connection with a consumer transaction involving a motor vehicle for a supplier of motor vehicles not to integrate into a written contract all material statements, representations, or promises, oral or written, made prior to the written contract by his agent, representatives, or salesmen, to a consumer.

■ With regard to the instant case, defendant's statement or representation that the auto was in "A-Number One" condition was not made a part of the sale order form. Nor were any of his other material pre-sale statements incorporated into the sales agreement. Rather, the form constituting the contract of sale indicated that the auto was "SOLD AS IS" without any warranties. It thus appears that defendant committed a deceptive trade act in not integrating such statement into the written agreement. The Court, therefore, finds that defendant violated § 1345.02.

■ For her third claim plaintiff alleges that defendant committed an unconscionable sales practice in violation of Ohio Revised Code § 1345.03(A) and (B)(1), (2), (3), and (6). Section 1345.03 provides:

(A) No supplier shall commit an unconscionable act or practice in connection with a consumer transaction. Such an unconscionable act or practice by a supplier violates this section whether it occurs before, during, or after the transaction.

(B) In determining whether an act or practice is unconscionable, the following circumstances shall be taken into consideration:

(1) Whether the supplier has knowingly taken advantage of the inability of the consumer reasonably to protect his interests because of his physical or mental infirmities, ignorance, illiteracy, or inability to understand the language of an agreement;

(2) Whether the supplier knew at the time the consumer transaction was entered into that the price was substantially in excess of the price at which similar property or services were readily obtainable in similar consumer transactions by like consumers;

(3) Whether the supplier knew at the time the consumer transaction was entered into of the inability of the consumer to receive a substantial benefit from the subject of the consumer transaction;

(4) Whether the supplier knew at the time the consumer transaction was entered into that there was no reasonable probability of payment of the obligation in full by the consumer;

(5) Whether the supplier required the consumer to enter into a consumer transaction on terms the supplier knew were substantially one-sided in favor of the supplier;

(6) Whether the supplier knowingly made a misleading statement of opinion on which the consumer was likely to rely to his detriment.

It is important to recognize that, unlike the deceptive sales provision, commission of any

of the listed acts does not in and of itself constitute a violation of the Act. Rather, proof of such acts are only circumstances to be considered in determining whether an act or practice is unconscionable. O.R.C. § 1345.03. See Buckley, *Recent Consumer Protection Legislation in Ohio,* 22 Cleve.St. L.Rev. 393, 396–97 (1973).

Moreover, § 1345.03 adds a knowledge requirement noticeably absent from the corresponding section of the Uniform Consumer Sales Practices Act, 7 U.L.A. § 4 (Supp. 1976). Thus one commentator has analyzed the significance of this departure in the following manner:

> Even to make out a "circumstance" to be taken into consideration in determining unconscionability, it must be shown under § 1345.03 that the supplier "knew" what the impact of its behavior would be, or that the supplier "knowingly" engaged in proscribed behavior. The Uniform text requires instead that the supplier "knew or *had reason to know*" (emphasis supplied). The official comment states that, under the Uniform text, a course of conduct often will establish the requisite knowledge, and, in any event, *scienter* is not invariably required to establish unconscionability. Omission in Ohio of the "reason to know" language, particularly because it is in the Uniform text, will make it difficult to avoid proof of *scienter* under § 1345.03. (Footnotes omitted).

Buckley, *supra,* at 397–98. Whether such an interpretation will be borne out by the decision of Ohio courts remains to be seen in that there is a paucity of case law on the Act. One case that has come to the Court's attention does shed some light on the problem. In *Brown v. Market Development,* 41 Ohio Misc. 57, 322 N.E.2d 367 (C.P.1974), the court stated at 62, 322 N.E.2d at 371 that "it is the activity of the supplier that is pivotal in making the determination of unconscionability," and not the nature of the transaction or the consumer's mental state.

██ Looking at the circumstances considered by plaintiff to be relevant in light of the knowledge requirement, the Court must conclude that defendant did not com-

mit an unconscionable act or practice within the terms of § 1345.03. Although the defendant admitted that he knew plaintiff was ignorant with regard to automobiles, and could be considered to have taken some advantage of her in light of the same, such factor alone does not dictate an unconscionable practice. O.R.C. § 1345.03(B)(1). Defendant did not object to plaintiff's cousin's inspection of the vehicle, and defendant could have presumed some knowledge on the part of the cousin. Thus it appears that plaintiff was not without opportunity to protect her interests to some extent. Moreover, this one factor is outweighed by other considerations. Of overriding importance to any determination of unconscionability is the Court's earlier finding that plaintiff has failed to prove that the auto's condition was not as represented by defendant.

██ Plaintiff further contends that defendant knew at the time of the sale to plaintiff that the quoted price of the auto was substantially in excess of the price of similar autos readily obtainable in like transactions. O.R.C. § 1345.03(B)(2). No evidence was presented, however, as to either the excessiveness of the price or defendant's knowledge of the same. Plaintiff further claims that defendant knew at the time of the transaction of plaintiff's inability to obtain substantial benefit from the subject vehicle. O.R.C. § 1345.03(B)(3). Again, however, there is no evidence of the same. Rather defendant thought that the auto was in "A-Number One" condition, and was even planning to allow his daughter to use the auto. Clearly, defendant did not know that the auto would not be beneficial for transportation purposes at the time of the sale. In addition, plaintiff did derive benefit from the auto until the oil pan was damaged causing the eventual engine lockup.

██ Finally, plaintiff contends that defendant knowingly made a misleading statement on which plaintiff was likely to rely to her detriment. O.R.C. § 1345.-03(B)(6). The one statement of opinion on which plaintiff appears to have relied was that the auto was in "A-Number One" con-

dition. There is no evidence, however, that at the time defendant made that statement he knew it was misleading. On the contrary, as the Court has already found, defendant thought the car was in such condition in light of all the repairs he made in anticipation of making a gift of the same to his own daughter. Thus, the Court must conclude that defendant did not know his statement of opinion was misleading when made. Moreover, the Court has previously found no evidence that the car was not in the condition represented.

Therefore, upon consideration of the above four factors and in light of all the evidence presented, the Court cannot conclude that defendant committed an unconscionable sales practice within the meaning of § 1345.03. The Court thus finds that defendant did not violate the same.

■ With regard to plaintiff's second and third claims then, the Court has found a single violation of a rule promulgated pursuant to § 1345.05(B)(2) and establishing a deceptive sales practice. Pursuant to § 1345.09(B), a consumer is entitled to relief in the form of recission of the transaction, or actual damages or one hundred dollars, whichever is greater. Recission or revocation of a contract of sale is not available, however, unless the same occurs within a reasonable time after the consumer discovers or should have discovered the reason therefor, and before a substantial change in the condition of the subject of the transaction. O.R.C. § 1345.09(C).

■ Plaintiff in her complaint has prayed for actual damages in the amount of One thousand five hundred dollars ($1,500.00) or in the alternative for recission. In the instant action, however, the original engine on the subject automobile had to be replaced and the replacement engine is locked rendering the automobile inoperable. Thus there has been a substantial change in the auto's condition thereby precluding recission of the contract under the terms of § 1345.09. Also, despite plaintiff's claims as to her actual damages, the Court finds that plaintiff has actually incurred no damages as a direct result of the failure of defendant to incorporate into the sales agreement his representations concerning the automobile. Thus, the Court shall award plaintiff damages in the amount of One hundred dollars.

Plaintiff's fourth and final claim seeks actual and punitive damages for defendant's alleged fraud. This Court in *Lloyd v. Classic Motor Coaches, Inc.,* 388 F.Supp. 785 (N.D.Ohio 1974), set forth the elements of actionable fraud in Ohio at 791:

"1. A false representation; actual or implied, or the concealment of a matter of fact, material to the transaction, made falsely.

2. Knowledge of the falsity—or statements made with such utter disregard and recklessness that knowledge is inferred.

3. Intent to mislead another into relying on the misrepresentation.

4. Reliance—with a right to rely.

5. Injury as a consequence of that reliance.

All of these elements must be present if actionable fraud is to be found." *Crabbe v. Freeman,* Ohio Mun., 160 N.E.3d 583, 585, 81 O.Law Abst. 65, 67 (1959).

■ In this case, defendant's statements that the auto was in "A-Number One" condition and that he purchased it from an old man who had taken good care of the same are alleged to have been fraudulent. These statements do not, however, satisfy all the conditions necessary to a finding of fraud. Therefore, absent such a finding plaintiff is not entitled to either actual or punitive damages based on the same.

Accordingly, the Court finds that defendant is indebted to plaintiff in the amount of One hundred dollars ($100.00).

IT IS SO ORDERED.