OPINION
Plaintiff-Appellant Jeffrey Jones filed this suit against Defendant-Appellees, Timothy Davenport and Snyder Brick and Block, regarding masonry work done on his new home. Jones, working without a general contractor in building his home, subcontracted with Davenport to brick the outside of the house and two fireplaces. Jones selected the brick on his own, verifying the color and style on a sample board belonging to Snyder. He then ordered the brick through Snyder, who delivered it to the site. As a basis for his claims for relief, Jones argues that the majority of the brick was not the color that he ordered, and the few that were the correct color contrast and diminish the appearance of the house.
Jones filed a partial motion for summary judgment regarding his second cause of action for slander of title. On January 16, 1998, the trial court sustained the motion in part, and overruled it in part. The court invalidated the mechanic's lien that Davenport had placed on the residence and ordered that the lien be immediately released. However, the court found no evidence supporting the slander of title claim and thus overruled that part of the motion.
Thereafter, the case was referred to the magistrate for trial. Following Jones' case in chief, the magistrate granted Snyder's Civ.R. 41(b) motion for involuntary dismissal on all counts against him. On August 2, 1999, the magistrate issued findings of fact and conclusions of law, finding in favor of Davenport on the claims against him and awarding $10,400 on his counterclaim.
Timely objections were filed by Jones regarding the magistrate's findings. However, no transcript or affidavits were filed. Civ.R. 53(E)(3)(b) provides in part:
 Any objection to a finding of fact shall be supported by a transcript of all the evidence submitted to the magistrate relevant to that fact or an affidavit of that evidence if a transcript is not available. A party shall not assign as error on appeal the court's adoption of any finding of fact or conclusion of law unless the party has objected to that finding or conclusion under this rule.
In accordance with this rule, when the party objecting to a magistrate's decision fails to supply a transcript to the trial court, the appellate court is precluded from considering the transcript submitted with the appellate record. State ex rel. Duncan v. Chippewa Twp. Trustees (1995), 73 Ohio St.3d 728, 730; Shull v. Shull (1999),135 Ohio App.3d 708; Vistula Mgt. Co. v. Newson (1997),120 Ohio App.3d 500, 503; Sochor v. Smith (June 28, 2000), Licking App. No. 00CA00001, unreported, at p. 3. Instead, the appellate court must accept the magistrate's findings of fact as established and appellant may not attack those findings on appeal. Ackroyd v. Ackroyd (June 30, 2000), Lake App. No. 99-C-018, unreported, at p. 1; Sochor, supra. As a result, the appellate court's review is limited to whether the trial court abused its discretion in adopting the magistrate's decision. Newson, Ackroyd, and Sochor, supra. An abuse of discretion implies that the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. Therefore, as we examine each assignment of error raised by Jones, we will determine if the trial court abused its discretion in applying the applicable law to the magistrate's findings of fact.
On appeal, Jones has raised the following assignments of error:
 I The trial court erred by disposing of Plaintiff's second cause [of] action for slander of title, in response to Plaintiff's motion for partial summary judgment, prohibiting the presentation of evidence on the claim at trial, and by failing to award damages to Plaintiffs.
 II The trial court erred by failing to award damages on the sixth cause of action for Defendant Snyder's violation of the Consumer Sales Practices Act. Attorney's fees issue. The trial court erred by finding that Defendant Snyder did not knowingly violate the Consumer Sales Practices Act and, thus, failed to award attorney fees on the sixth cause of action. Actual damages issue. The trial court erred by finding that Plaintiffs/Appellants failed to mitigate their damages, thus precluding recovery of actual damages, which in turn precluded recovery of treble damages on the sixth cause of action.
 III The trial court erred by dismissing Plaintiff/Appellant's fourth cause of action against Defendant Snyder for breach of contract.
 IV The trial court erred by dismissing Plaintiff/Appellant's fifth cause of action against Defendant Snyder for breach of warranty.
 V The trial court erred by finding that the greater weight of the evidence clearly establishes that Defendant Davenport substantially performed the contract in a workmanlike manner, thus finding for Defendant on the first and third causes of action.
 VI The trial court erred by awarding damages on Davenport's counterclaim in excess of the balance due under the contract.
 I
Jones' first assignment of error refers to the disposition of his claim for slander of title. Specifically, Jones argues that the trial court erred in overruling his motion for summary judgment, in prohibiting the presentation of evidence, and in failing to award him damages.
First, the issue of whether overruling a summary judgment motion was correct is a proper question for appeal when the judgment after trial is adverse to the movant. Nayman v. Kilbane (1982), 1 Ohio St.3d 269, 271. In the motion for summary judgment, Jones argued that the mechanic's lien Davenport placed on his house should be released and that Davenport should be held liable for slander of title. Jones also claimed that Davenport mailed the affidavit in support of the mechanic's lien to his prior address, even though Davenport was aware that Jones had moved to the subject property. The trial court found that failing to mail the affidavit to the correct address within the statutory period invalidated the mechanic's lien. As a result, the court sustained that portion of the motion and ordered the lien to be removed. However, the trial court additionally found no evidence at that time that Davenport had acted with malice when placing the mechanic's lien on Jones' property and mailing the affidavit to the wrong address. Therefore, the court overruled the slander of title portion of the motion. We agree with this finding of the trial court.
Jones also argues that the magistrate prevented testimony regarding slander of title at the trial. However, there is nothing in the record journalizing this proscription. In fact, in her decision, the magistrate found "[n]o additional evidence presented at trial to establish the elements necessary to establish a claim for slander of title." It is well settled that a trial court only speaks through its journal entries. Hairston v. Seidner (2000), 88 Ohio St.3d 57, 58. Because the record contains no decision prohibiting testimony on the slander of title claim, we cannot find error.
Therefore, we are limited to determining whether the trial court abused its discretion in adopting the magistrate's decision as it pertained to the slander of title claim. An individual may be held liable for slander of title when he "falsely and maliciously defames the property of another, causing him special damage." Builder Services, Inc. v. Habitat Condominium Owner's Assn. (Jan. 22, 1999), Montgomery App. No. 17247, unreported, at p. 5 (citations omitted). Malice can be found when an individual recklessly or wantonly disregards the rights of another. Childers v. Commerce Mtge. Invests. (1989), 63 Ohio App.3d 389, 392.
Jones contends that even if the trial court was correct that Davenport did not act maliciously in obtaining the mechanic's lien, Davenport certainly acted maliciously by refusing to release the lien following the trial court's order to do so. However, in her findings of fact, the magistrate found that no evidence was presented at trial to establish a claim for slander of title. Because we have nothing in the record precluding testimony on slander of title, and no transcript was submitted to the trial court, we must rely on the magistrate's findings of fact to ascertain whether Jones' case for slander of title was proven. Based on the magistrate's finding that no evidence at all was presented on the subject, we cannot find that the trial court erred in adopting that portion of the magistrate's decision. Accordingly, Jones' first assignment of error is overruled.
 II
In the second assignment of error, Jones challenges the trial court's findings on his Consumer Sales Practices Act ("CSPA") claim. On this particular issue, the trial court did not adopt the magistrate's conclusions of law, but found in favor of Defendant Snyder for different reasons. Jones has alleged that Snyder violated R.C. 1345.02(B)(5), which provides that "the act or practice of a supplier in representing any of the following is deceptive: * * * [t]hat the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not* * *."
The magistrate's decision focused on Jones' status as a general contractor for his own home, which she found bestowed a duty on him above the average consumer. In this regard, the magistrate reasoned that because Jones was a general contractor, Snyder was not required to point out either the disclaimer found on the sample board or the one delivered with the bricks. Further, the magistrate found Jones had a duty to inspect the bricks upon arrival at the site to discover any potential problems. The trial court disagreed with these findings. Instead, the trial court found that Jones' status was no different than an average consumer even though he assumed the role of general contractor in building his own home. As a result, the court found Snyder violated R.C. 1345.02(B)(5). However, because testimony revealed that Jones was aware of the color discrepancy and instructed Davenport to install the bricks anyway, the trial court found that Jones did not mitigate his damages. This failure to mitigate left Jones without a remedy.
We disagree with the findings of both the magistrate and the trial court. R.C. 1345.02(B) clearly states that the supplier acts deceptively by representing any of the items listed in subsections (1) through (10). Representation is defined as "any conduct capable of being turned into a statement of fact." Black's Law Dictionary (6 Ed.Rev. 1990) 1301. When examining the cases involving R.C. 1345.02, we found that representation has been construed to involve some sort of communication from supplier to consumer. See e.g. Farley v. Performance Toyota (1991), Butler App. No. CA91-06-109, unreported, at p. 4 (finding no violation of R.C.1345.02(B)(5) because there was no evidence defendant held itself out as dealership which inspects all used cars); Defrank v. Mullen (Dec. 2, 1999), Cuyahoga App. No. 75110, unreported, at p. 4, citing Clayton v. McCary (1976), 426 F. Supp. 248 (finding violation of the act when dealer stated car was in "A-Number One Condition," but did not include that language in contract with "as is" language); Ford v. Brewer (Dec. 9, 1986), Franklin App. No. 86 AP-626, unreported, at p. 2 (hiding that a car was wrecked, and instead telling the consumer the original buyer had a change of heart violates R.C. 1345.02); Lardakis v. Martin (July 29, 1994), Summit C.P. No. CV 94-01-0234, unreported, at p. 2 ("[a] supplier's practice of engaging in any fraudulent oral or written misrepresentations, or otherwise conveying factually incorrect information to clients, is an unfair and deceptive practice in violation of R.C. 1345.02"); State ex rel. Celebrezze v. Consumer's Edge, Inc. (Oct. 1, 1990), Franklin C.P. No. 90CVH04-2646, unreported, at p. 2 (finding violation of the act where supplier informed consumers they were "finalists" in a sweepstakes when all consumers received same notice).
The magistrate made the following findings of fact concerning the interaction between Jones and Snyder. Jones was referred to Snyder by a personal friend, John Fann, who works for Nurre Building Materials, a construction supply business. When Jones met with Fann, Jones had already chosen the color and style of brick he desired for his home. Fann informed Jones that Snyder was the only supplier in the area that carried that specific brick. Thereafter, Fann provided Jones with a sample board from Snyder to verify the color and style of brick. The sample board stated: "Samples prepared to show general color and texture. Usual color variations from these samples may be expected." Jones took this sample board to Snyder along with the building plans to determine how many bricks were needed. The sales documents indicate that Snyder ordered twenty-seven thousand white rockface face brick and twenty-five hundred white rockface corner bricks from Kings Mountain. Subsequently, the brick was delivered, stacked on a pallet and wrapped in clear or black plastic, to Snyder's warehouse. After verifying the quantity was correct, Snyder delivered the brick to the job site. Each pallet contained a tag with the following statement:
 If upon delivery the shipment fails to meet color and quality standards, the manufacturer is to be notified. If notification is not received within 48 hours after shipment, product is deemed satisfactory. In no case does the manufacturer assume any responsibility after material is erected in the wall. Manufacturer disclaims any and all responsibility for improper cleaning.
We must point out that the magistrate specifically found that Jones had admitted Snyder made no misrepresentations. In fact, the magistrate made no finding that Snyder made any representations to Jones at all.
Relying on the facts as found by the magistrate, we fail to see where Snyder made any representations to Jones about the brick, except that Snyder would order the brick requested by Jones. The sales documents referenced by the magistrate confirm that Snyder did, in fact, order the brick as requested by Jones.
The only other potential representation made by Snyder would be the sample board itself. The purpose of the sample board is to inform customers of brick available for order. Directly on the board is a disclaimer indicating that the color of the brick may vary from the sample. As a result, the potential "communication" made by the sample board would simply be that Snyder could order King's Mountain white brick, but the delivered brick could vary from the color on the board. At no time did Snyder make any representations to Jones regarding the color of the bricks that would be delivered to Jones.
Additionally, the trial court found that Snyder had a duty to inspect the bricks before they left the warehouse. We disagree. Snyder had a duty to order the bricks as requested by Jones and then deliver them to the job site, which it did. In fact, the magistrate made a specific finding that Snyder delivered exactly what was ordered, and the color variation was due to a manufacturing error. Moreover, it would be absurd to require Snyder to unwrap each pallet of brick that arrives in its warehouse that is tightly wrapped and bound in plastic, just to turn around and wrap it again to ship it directly out to the consumer. This is particularly true because of the notice placed in each pallet of brick, advising the consumer to inspect the brick and report any color variations or problems found prior to installation.
Because no misrepresentation was made by Snyder as to the specific color of the bricks Jones would receive, we find that R.C. 1345.02(B)(5) was not violated. Therefore, the mitigation issue raised by the trial court is irrelevant, and attorney fees are not appropriate under R.C.1345.09(F).
 III
Jones' third assignment of error challenges the trial court's dismissal of his breach of contract claim against Snyder. According to the magistrate's findings of fact, the brick was delivered to Jones in September of 1994. Two brick masons testified that the color variation was obvious when the bricks were delivered. Both Tim Davenport and one other mason stated that they advised Jones of the color variation in the brick that fall. However, Jones instructed them to continue installing the brick and said he would resolve it later with Snyder. In addition, Greg Davenport testified that the color variation was not discovered until spring, at which time he advised Jones of the problem and was also told to continue working. On the other hand, Jones claimed that he did not detect the color variation until the spring, when the majority of the bricks had been installed.
Based on the above testimony, the trial court found that Jones, as the buyer, failed to timely reject the brick or notify Snyder of any breach. R.C. 1302.64(A)(2) provides that acceptance occurs when the buyer fails to reject the goods delivered after he has had a reasonable opportunity to inspect them. Further, after acceptance, a buyer has the burden to notify the seller of any breach "within a reasonable time after he discovers or should have discovered any breach." R.C. 1302.65(C)(1). When a trial court's decision involving R.C. 1302.01 et seq. is based on competent, credible evidence, a reviewing court will not disturb it on appeal. George v. Fannin (1990), 67 Ohio App.3d 703, 709, citing Konicki v. Salvaco, Inc. (1984), 16 Ohio App.3d 40, 42.
Because the trial court found that Jones accepted the brick and failed to timely revoke that acceptance, Jones is barred from recovery under R.C. 1302.54(C)(1). We find that the trial court's decision is supported by competent and credible evidence and will not disturb it on appeal. In light of the above discussion, Jones' third assignment of error is overruled.
 IV
In the fourth assignment of error, Jones alleges that the trial court erred in dismissing his breach of warranty claim against Snyder. In this regard, Jones focuses on the trial court and magistrate's application of implied warranty law after the magistrate made a finding that an express warranty existed. We agree with Jones that both the magistrate and the trial court improperly relied on implied warranty law in their decisions. However, we do not agree that Snyder is liable to Jones for breach of an express warranty.
The magistrate explicitly found that "the sample board created an express warranty that the goods ordered would be supplied in a comparable color," in accordance with R.C. 1302.26(A)(3). This section provides that "[a]ny sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model." To determine whether a statement, or in this case a model, formed the basis of the bargain, the court must examine "the circumstances surrounding the sale, the reasonableness of the buyer in believing the seller, and the reliance placed on the seller's statement by the buyer." McCormack v. Knight (June 19, 1989), Clermont App. No. CA88-11-080, unreported, at p. 2, citing Slyman v. Pickwick Farms (1984), 15 Ohio App.3d 25, 28. The magistrate found that Jones had decided on the color and style of brick before seeing Snyder's sample board. The sample board served as a basis to confirm the type of brick desired and to specify to Snyder what to order. Significantly, however, the sample board contained a disclaimer which read: "Samples prepared to show general color and texture. Usual color variations from these samples may be expected."
Although we agree with Jones and the magistrate that an express warranty existed, we also find that the disclaimer properly modified or limited the warranty.
 Concerning limitation of express warranties, R.C.1302.29(A) provides:
 [w]ords or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of section 1302.05 of the Revised Code on parol or extrinsic evidence, negation or limitation is inoperative to the extent that such construction is unreasonable.
Under this section, it is difficult for a seller to disclaim express warranties because they generally form the basis of the bargain and, therefore, would be unreasonable to disclaim. See Ohio Sav. Bank v. H.L. Vokes Co. (1989), 54 Ohio App.3d 68, 72; Society Nat. Bank v. Pemberton (1979), 63 Ohio Misc. 26, 29. In fact, the Official Comment to this section explains the purpose for restricting disclaimer of express warranties:
 This section is designed principally to deal with those frequent clauses in sales contracts which seek to exclude `all warranties, express or implied.' It seeks to protect a buyer from unexpected and unbargained language of disclaimer by denying effect to such language when inconsistent with language of express warranty and permitting the exclusion of implied warranties only by conspicuous language or other circumstances which protect the buyer from surprise.
(Emphasis sic.) Kociubuk v. Huntington Nat. Bank (Jan. 6, 1994), Cuyahoga App. No. 64551, unreported, at p. 8, citing Official Comment to R.C.1302.29. This is evidenced by a number of cases which found a seller improperly attempted to disclaim a previous written or oral express warranty in the contract that followed. See e.g. H.L. Vokes Co.,54 Ohio App.3d at 72 (holding Trane's description of air conditioning unit which formed the basis for sale could not be negated in later sales contract); General Motors Acceptance Corp. v. Grady (1985), 27 Ohio App.3d 321, 323
(prohibiting car dealer from expressly limiting agreement to contents of purchase order which included express warranties and then disclaiming these warranties in retail installment contract); Kociubuk, supra (finding any express oral warranties given regarding the fitness of the vehicle could not be negated in purchase agreement); and Pemberton,63 Ohio Misc. at 29 (also finding express oral warranties could not be disclaimed in purchase agreement).
However, the language of R.C. 1302.29(A) does allow an express warranty to be negated or limited, if the disclaimer is not unreasonable. In the present case, the disclaimer which limited the warranty was located directly on the sample board. When an individual viewed the board, he would also have to see that any warranty was limited by the disclaimer language which said that colors could vary from what was shown on the board. Jones even admitted that he read the disclaimer when he saw the sample board. Consequently, this is not a case where the buyer needs protection from unbargained and unexpected disclaimers as intended by the code. The present situation appears instead to be the remote case in which a seller has effectively limited an express warranty.
Notwithstanding the effectiveness of the limitation, an express warranty under R.C. 1302.26(A)(3) assures that "the whole of the goods shall conform to the sample or model." (Emphasis added). Thus, even though the warranty was limited by the disclaimer language that the actual bricks may vary in color from the sample board, this does not necessarily permit a variation of color among the bricks delivered. Nevertheless, even if the express warranty was breached, Jones is still barred from recovery because he failed to timely notify Snyder under R.C. 1302.65.
As discussed previously, Jones clearly accepted the bricks pursuant to R.C. 1302.64(A)(2) by failing to reject them after a reasonable opportunity to inspect. Further, R.C. 1302.65(C)(1) bars a buyer from any remedy if he fails to notify the seller within a reasonable time after he discovers or should have discovered the breach. This provision applies not only to a breach of contract, but also to breach of an express warranty. AGF, Inc. v. Great Lakes Heat Treating Co. (1990),51 Ohio St.3d 177, 179-80. Because Jones failed to notify Snyder of the breach after he discovered, or at least should have discovered the color discrepancy, he is barred from recovery under an express warranty theory. Therefore, Jones' fourth assignment of error is overruled.
 V
Jones argues in his fifth assignment of error that the trial court's decision on the breach of contract and negligence claims against Davenport was against the manifest weight of the evidence. When evaluating a manifest weight claim, the appellate court should review the record, weighing the evidence and credibility of the witnesses to determine if the "[trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the [decision] must be reversed and a new trial ordered." State v. Thompkins (1997), 78 Ohio St.3d 380,387. However, we have already established that we are precluded from reviewing the transcript in this case, which makes it impossible to weigh the evidence and credibility of witnesses. Instead, we are limited to reviewing the magistrate's findings of fact and determining if the trial court abused its discretion in adopting the magistrate's finding. See State ex rel. Duncan v. Chippewa Twp. Trustees, 73 Ohio St.3d at 730.
First, we must briefly address Jones' argument that the magistrate and trial court used the wrong standard of care for Davenport's workmanship. The trial court properly determined that contractors have a duty to perform in a workman-like manner. Lin v. Gatehouse Constr. Co. (1992),84 Ohio App.3d 96, 101, citing Barton v. Ellis (1986), 34 Ohio App.3d 251,253. "Workmanlike manner" has been defined as the way work is customarily done by other contractors in the community. Salewsky v. Williams (Sept. 17, 1990), Stark App. No. CA-8131, unreported, at p. 4. Jones argues that because the contract states that work is to be completed in a "substantial workman-like manner," that Davenport should be held to a higher standard of care than the legal standard. We find this argument absurd. However, since Jones has engaged us in this game of semantics, we must point out that one definition of "substantial" is "being largely but not wholly that which is specified." Considering this definition, the contract language could have been intended to place a lesser standard of care on Davenport that the work be performed in a largely, but not wholly workman-like manner. This interpretation is equally absurd. We find no reason to stray from the well-established standard of care found in Ohio case law that the contract be performed in a workman-like manner.
In her findings of fact, the magistrate addressed all areas where Jones indicated Davenport performed in an unworkman-like manner:
 Although Jones testified that he was unsatisfied with the quality of the workmanship of the brick installation, the greater weight of the evidence supports a finding that the work was done in accordance with community standards. The photos of the brick work do show problems with the mortar, uneven joints, and lines that appear to be out of plumb. However, it was explained that the mortar problem was due in part to stones or gravel in the sand, which was purchased and provided by Jones. Additionally, it was not possible to clean off splashed mortar within a reasonable time after installation because Jones did not provide running water on the site until the spring when the job was completed.
 The difference in mortar color was caused by mixing separate batches of mortar in different weather conditions. Cracking was caused by the problems inherent in laying brick with mortar in the winter, including ice chips in the sand, although the timing of the job was at the direction of the Plaintiff. It was further established that standard workmanship was employed to assure that lines were laid in even horizontal lines or courses, but that the design of the house combined with the topography of the site required numerous step adjustments. Additionally, the fact that the windows were installed out of plumb require the brick masons to make adjustments around the windows. It was also more difficult to keep the lines or courses straight because of rocks and gravel in the sand, which was provided by the Plaintiff. Some of the uneven joints were caused by the difference in size between the corner brick and the face brick, and the fact that corner bricks have a rough edge which gives a crooked appearance when abutted next to flat edge or another rough edge brick. The Defendant explained that cracks in the chimney area occur due to extreme heat expansion and cold contraction when using a fireplace in the winter. These cracks will widen when water seeps in and freezes and eventually moves down into the adjoining bricks. No rebuttal evidence was offered to establish that such cracks were the result of improper workmanship.
 The only clear unworkman-like issue was the mistake made by the brick layers to use a few corner bricks in the face of a wall, which is readily apparent because of the color difference and the appearance of crooked seams or joints on the rough edge side of the corner brick. The evidence did support a finding that there are no structural problems with the brick installation.
 Plaintiff was also unsatisfied with the stains which Cappeared on the brick at the rear of the house after the deck was installed. No witness could identify the cause of the stain with any certainty, although it was speculated that it seeped from the clay from the bricks, the excessive iron in the well water on site, or the stain used on the wood deck. It was further surmised that other areas of stain or discoloration of the brick near ground level could have resulted from ground splatter. Another witness, Bill Anderson, an experienced brick mason, suggested that the stain was derived from excess cleaning solution. Anderson also stated because white brick is very soft and porous it does stain easily if not sealed properly. It was established that the specifications for the house did not include sealing the brick. The Defendant explained that sealing brick is usually done on the job site at the direction of the general contractor, but it was not ordered for this job.
 Plaintiff was also unsatisfied with the Defendant's failure to use solid bricks to frame the edge of the windows. However, the testimony revealed that it was very uncommon for Snyder to order solid bricks, and they never do so without specific order from the general contractor. It was also the testimony of all the brick masons that it was standard practice in this area to use regular face brick and fill in the holes with mortar. It was also explained that the uneven appearance of the window sill row locks were due to the use of rockface brick.
Based on these findings, the magistrate held, and the trial court agreed, that the greater weight of the evidence established that Davenport performed the contract in a workman-like manner. After reviewing these findings, we conclude that the trial court did not abuse its discretion in adopting the magistrate's decision on the breach of contract and negligence claims against Davenport. See Newson,120 Ohio App.3d at 503. Accordingly, Jones' fifth assignment of error is overruled.
 VI
Finally, Jones disagrees with the amount of the trial court's award to Davenport on his counterclaim. The magistrate found that the total amount of the contract was $24,850, and that Jones had paid $14,450, leaving a balance due under the contract of $10,400. There is no further explanation in her decision establishing the basis for these figures. Nonetheless, we are limited by the findings of the magistrate in our consideration of this issue. Under R.C. 1302.65(A), because Jones accepted the brick, he is required to pay the total amount due under the contract. Consequently, we find no error in this award and overrule Jones' sixth assignment of error.
Judgment affirmed.
WOLFF, P.J., and GRADY, J., concur.